**WO**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Konnie Drake, | No. CV-22-01384-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Living Spaces Furniture LLC, | |
| Defendant. | |

## INTRODUCTION

In 2009, Konnie Drake ("Plaintiff") began working for Living Spaces Furniture LLC ("Defendant") as a sales associate.  In 2013, Plaintiff transferred to Defendant's new location in Scottsdale, Arizona.  Plaintiff contends that, shortly after this transfer, he became the target of racial comments by other employees, including supervisors, and also struggled to complete certain tasks due to a hand injury he had sustained years earlier.

In June 2014, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") (the "First EEOC Charge").  In April 2015, Plaintiff filed another charge of discrimination with the EEOC (the "Second EEOC Charge").  A few days later, Defendant terminated Plaintiff's employment.  Shortly thereafter, Plaintiff filed a third charge of discrimination with the EEOC (the "Third EEOC Charge").

For unknown reasons, the EEOC did not complete its investigation into Plaintiff's allegations for many years.  Finally, in May 2022, the EEOC issued Plaintiff a right-to-sue letter.  Plaintiff then brought this action against Defendant for racial discrimination,

retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and disability discrimination in violation of the Americans with Disabilities Act ("ADA").

Now pending before the Court is Defendant's motion for summary judgment. (Doc. 56.)  For the reasons that follow, the motion is granted in part and denied in part.

## BACKGROUND

The background facts below are taken from the parties' summary judgment submissions and other materials in the record and are uncontroverted unless otherwise noted.  Additional facts bearing on the parties' specific summary judgment arguments are addressed in the Discussion portion of this order.

I.    Relevant Factual Background

In around 2005 or 2006, Plaintiff sustained injuries to his left hand while working in a factory.  (Doc. 56-2 at 40-41.)  These injuries left him with only 10% function in his left hand.  (Doc. 56-3 at 180.)

On May 13, 2009, Plaintiff began working for Defendant as a part-time sales associate in its La Mirada, California store.  (Doc. 56-2 at 18.)

On July 6, 2009, Plaintiff was promoted to a full-time sales associate.  (Id.)  In his ensuing 90-day review, Plaintiff "received all average or outstanding scores" and a raise.  (Id. at 19.)

In May 2010, Plaintiff received a positive performance review and raise.  (Id. at 20.)

In July 2010, Plaintiff was promoted to sales lead and received another raise.  (Id.)

In his May 2011 performance review, on a scale from 1 to 5, Plaintiff received 3s for punctuality, 3s and a 4 for business ethics, 3s and a 2 for communications, 3s for customer service, 2s and 3s for organizational support, a 2 and 3s and 4s for sales skills, and 2s for teamwork.  (Id. at 144-45.)

On July 25, 2011, Plaintiff went back to working as a "parts specialist."  (Id. at 24-25.)[1]

---

[1]    Plaintiff alleges that he went back to this position because a vice president informed

On August 11, 2010, 2011, or 2012, Plaintiff notified Defendant's human resources ("HR") office that he "could only lift up to 25 pounds" with his hand.  (*Id.* at 42.)

In February 2012, Plaintiff applied for a transfer to Defendant's Redondo Beach, California store.  (*Id.* at 29.)

On March 5, 2012, Plaintiff began working at Defendant's Redondo Beach store. (*Id.*)

In his April 2012 performance review, Plaintiff received positive reviews, scoring 4s and 5s out of 5 and receiving a one-time cash bonus.  (*Id.* at 29-30.)

In his April 2013 review, Plaintiff received 3s and above out of 5 on his performance review and another one-time cash bonus.  (*Id.* at 31.)  That same month, Plaintiff also applied for and was selected to be part of the leadership team at Defendant's new Scottsdale, Arizona location.  (*Id.* at 31-32.)  With the move to the Scottsdale location, Plaintiff was promoted back to department lead.  (*Id.* at 147.)

In June 2013, Plaintiff began working at the Scottsdale location.  (*Id.* at 39.)

On August 3, 2013, during a training session being led by Plaintiff, a co-worker told Plaintiff that he was "[t]oo black," then clarified that she meant to say he was going "too fast."  (*Id.* at 96-97; Doc. 56-3 at 171.)  Following the incident, other employees continued to call Plaintiff "too black, too fast" and began calling him the "N word."  (Doc 56-2 at 97.)

On September 25, 2013, Plaintiff was written up by one of his supervisors, Trish Green ("Green").  (Doc. 56-2 at 150-52.)  The write-up provided five examples of workplace behavior that did "not meet the company's expectations as it relates to the . . . Department Lead job description."  (*Id.* at 150-51.)  Plaintiff disputes that the events occurred or that the events were properly characterized in the write-up.  (*Id.* at 113-17.) Plaintiff "[r]efused to sign" the document.  (*Id.* at 152.)

On November 1, 2013, Plaintiff sent a letter to Toni Moyer ("Moyer"), an HR employee, and others in which Plaintiff identified the following incidents:

---

him "that [the vice president] was going to fire all the leadership."  (*Id.*)

*Aug. 3 – Word "Fast" originated.

*Aug. 29 – Statement from Trish about Lance, "It takes a fast man to fire a fast man." -- She wanted Lance fired, my reply was, "if you want to fire him; fire him now because if you put him in my department I will be couching [sic] him."

*Sept. 18 – Couching [sic] concerning all the Values for the company. This was to keep me from applying for Sales Manager at the Phoenix store.

*Sept. 21 – Private party and selective invitation to conspire against me.

*Sept. 25 – Conspire against me turned into a three-page write up. (Write up was sent via email)

*Oct. 12 – GM (Trisha Green) and Sales Manager[] (Chris Clark) stated, "Fast man you don't have to drive around the building any more, we unplug [the] counters."

*Oct. 23 – After three (3) months of hearing "Fast Man" on a daily basis; this was the last time I heard it.

(Doc. 56-3 at 171.)

In his 2013 performance review, Plaintiff received an overall score of 4 out of 5 and a raise. (*Id.* at 196-200.) The review included qualitative feedback on Plaintiff's strengths, opportunities, and inconsistencies. (*Id.* at 196-98.) One of the recommendations was that Plaintiff "needs to approach all situations with an objective point of view, he can be very protective of his team and tend to take sides quickly." (*Id.* at 197.)

Possibly in February 2014,[2] Plaintiff submitted a letter entitled "2nd Letter Fear for my job (harassment, bully, targeted)," in which he described five events in February 2014 in which he felt he was being subjected to discrimination and retaliation. (*Id.* at 193-94.) The events were described in the letter as follows. First, on February 12, 2014, Plaintiff asked Nichole Mendenhall ("Mendenhall"), his general manager, and A.J. Dekker ("Dekker"), his sales manager, if he could arrive late for work to attend an event for his

---

[2]     The letter is not dated and does not identify a recipient. In his deposition, Plaintiff testified that he did not recall when he wrote the letter but guessed that it was around February 2014 and that he "probably" sent the letter to HR. (Doc. 60-3 at 101-02.) The specific date and recipient are not material to the analysis in this order.

daughter and HR responded that he would get "points." (*Id.* at 193.)[3]  A handwritten note under this entry provided that "[Plaintiff] actually told [Mendenhall] he would be into work around 2:00 and told [Dekker] that [Mendenhall] approved him to come in around 5:00 pm." (*Id.*, capitalization omitted.)[4]  Second, on February 19, 2014, Plaintiff sold a chair on the floor, the sale was initially approved by Dekker, but Dekker later said he did not approve the sale. (*Id.*)  A handwritten note under this entry provided that "[Plaintiff] told me on a phone call that he entered the sale so that . . . [the Chief Financial Officer] wouldn't know [the] item was sold off [the] floor." (*Id.*, capitalization omitted.)  Third, on February 22, 2014, Plaintiff "was retaliated against by [Dekker] for speaking about the issue of the chair" because when Plaintiff asked to use the restroom, Dekker refused to let him leave the floor. (*Id.* at 193-94.)  A handwritten note under this entry provided that Plaintiff sent one of his team members on a break, then asked Dekker for a break, Dekker told Plaintiff to wait until the team member returned, and Dekker then "allowed [him] to take a break." (*Id.* at 194, capitalization omitted.)  Fourth, on February 23, 2014, Plaintiff notified a sales manager that he was leaving early, but Dekker informed HR that Plaintiff "left [his] shift without notifying management." (*Id.*)  The handwritten note accompanying this entry provided that "it was not clear [to the sales manager] that [Plaintiff] was leaving.  [Plaintiff] continues to change his schedule without management approval." (*Id.*, capitalization omitted.)  Fifth, on February 24, 2014, the two sales managers on the floor, including Dekker, bullied Plaintiff and "st[ood] over [him] in dining and watch[ed] every move [he] ma[de]." (*Id.*)  Plaintiff also stated that he "would like the company to relocate [him] back to California.  [He] will step down as team lead d[ue] to the hardship created by [the] Scottsdale Management team and what the management team has put [him] through." (*Id.*)  The handwritten note accompanying this entry provided that "I offered [Plaintiff an] opportunity to step back to product specialist at the new Phoenix store and keep his current

---

[3]     Plaintiff describes "points" as being a negative: "Remember you have so many points that you can receive in a 90 day period." (*Id.*)

[4]     The author of the handwritten note—and the others described in this paragraph—is not identified, but from the context, the author was likely one of Plaintiff's supervisors.

rate of pay.  [Plaintiff] said I was treating him different from others by allowing him to keep his pay.  I informed [him] I would keep that offer open but would not return him to the California market."  (*Id.*, capitalization omitted.)

In April 2014, Plaintiff received a performance review and raise.  (Doc. 56-2 at 40.)

On June 4, 2014, Plaintiff sent a document entitled "Unfair Treatment Letter" to Veronica Owens-Cobb ("Owens-Cobb"), an HR employee.  (Doc. 56-3 at 202-06.)  In relevant part, the letter provided:

> I am writing this letter to lodge a formal complaint against my bosses, [Dekker] and [Mendenhall].  I feel that I have been given unfair treatment because of my race and my disability elements of my hand.  I feel that [Dekker] and [Mendenhall] do not give respect and fair treatment.  I have many occasions that I can state facts that prove [Dekker] and [Mendenhall] hinder me from my duties as a Team Lead in Dining in Scottsdale Arizona.  At first, I thought I was not getting the proper paper work in amount of time as the rest of my team leads because I was typing out my paper verses writing due to my disability of my writing hand.  However, once I felt I had proved myself to [Mendenhall] and [Dekker].  I expected [Dekker] and [Mendenhall] to consider me as equal with the rest of the team.  It was not until new employees joined us with less experienced, less educated, underperforming employees that I started to worry about my situation that received promotions.  I always receive some of the highest employee evaluations and employee marks before I was moved up to Team lead and I have received the same for Team Lead (dinning) [sic] department in Scottsdale AZ, but I still seem to be treated unfair over and over.  I thought it was maybe all in my head until some other employees began to notice my unfair treatment.  The employees suggested that I am not given the same treatment because I am from another race and that is not right. . . .  I feel like everything I do I am treated differently and unfairly.  I feel like I work in a hostile environment. . . .  I would like to move up in this company, but I am starting to feel like I will never be promoted if I keep receiving this unfair treatment by my superiors.  I have not been able to work these concerns out with [Dekker] and [Mendenhall] directly, so I would like to request some form action be taken place.  I would like you to look at my performance reviews and employee history and be able to resolve this problem.  This is a hostile, stressful unfair environment for me to work.  Please let me know if there's any other documentation I can provide.

(*Id.*)  The letter also described specific examples of unfair treatment, including that Dekker

did not allow Plaintiff to clock in early but allowed other employees to do so; that Mendenhall asked Plaintiff to work during the company dinner even though she corrected another employee's schedule to attend the dinner; and that Mendenhall got into an argument with Plaintiff and yelled at him when he requested a schedule change.  (*Id.* at 203-05.)

Owens-Cobb responded to each allegation.  Among other things, she "asked [Plaintiff] for specific example[s] where his disability was not tak[en] into consideration, [he] was unable to provide any examples and agreed that there were NOT any situation[s] where his disability was an issue and this is NOT a concern"; she identified one employee who clocked in early and discussed Plaintiff's schedule with him; she discussed Plaintiff's concerns over the company dinner; she received a statement from another employee corroborating Plaintiff's version of his conversation with Mendenhall about his schedule change; and she spoke to Mendenhall about Plaintiff's schedule and Mendenhall said the schedule was "due to hours availability and staffing [but] she will adjust the schedule." (*Id.* at 202-05.)

On June 10, 2014, Plaintiff made an unspecified "[a]llegation of discriminatory conduct which is displayed through unfair treatment."  (*Id.* at 202 [note describing the allegation].)

On June 24, 2014, Plaintiff filed the First EEOC Charge.  (*Id.* at 173-76.)  In it, Plaintiff alleged the following: a co-worker called him "too Black"; other co-workers called him "FAST Man, keeping the inference to [his] race always before [him]"; the general manager and sales manager wrote him up; he was denied interviews for promotions; he was accused of stealing a chair and temporarily suspended from work and Mendenhall did not "reasonably investigate" the matter when he reported it; he was micro-managed and harassed; he was denied transfers to new locations because of retaliation; and Dekker denied him a reasonable accommodation for data entry.  (*Id.* at 173-74.)

On July 10, 2014, Plaintiff emailed Mendenhall and a few other employees: "Time change with Jason and I on Friday, 7-11-14, I will be coming at 9:45 and he will take my

2:00pm-9:00 shift."  (Doc. 56-4 at 36.)[5]  When Mendenhall asked if Plaintiff received approval for the schedule change and to identify the reason for the change, Plaintiff responded: "Daughter have a volleyball tournament that I didn't want to miss."  (*Id.*)

On July 30, 2014, Plaintiff drafted a "To Whom It May Concern" letter discussing the "very challenging and biased wave of varying periods of verbal and systematic abuse that has damaged me physically, mentally, and financially."  (Doc. 56-3 at 212-13.)  Specifically, Plaintiff explained that he had "been denied the opportunity to be promoted while those with lower sales values, less experience, and less seniority have been moved into positions equal to and ahead of me without any consideration for my advancement" and was "not treated with the same respect and support as others within the same position."  (*Id.* at 212.)  Plaintiff also stated that "[a]lthough [he] ha[s] made several complaints to Human Resources and other leadership, the work environment has not improved," and he described the workplace as a "racially demoralizing, unequal, and abusive employment environment.  This damaging environment is supported, accepted, and encouraged by my General Manager ([Mendenhall]) and my Sales Manager ([Dekker])."  (*Id.* at 212-13.)

On September 26, 2014, Jeff Brodin ("Brodin"), an outside investigator hired by Defendant to look into allegations of discrimination, interviewed Plaintiff.  (*Id.* at 179-87.)[6]  In relevant part, Brodin's summary of the interview provided that Plaintiff "has a disability in his left hand.  He only has 10% use of that hand. . . .  It affects his ability to move furniture.  For five years it's never been an issue until he moved to Scottsdale.  He has difficulty typing reports and is not given enough time to do so.  It has become a problem with moving things since they put chairs up on the wall.  If his team members are not around to help, he is unable to pull a chair off the wall.  If his team members are around to help, it is not a problem.  He cannot do some tasks that require the use of two hands."  (*Id.* at 180.)  Plaintiff added to the interview notes that the "[c]ompany has documentation of

---

[5]     The parties dispute whether Plaintiff asked for this schedule change or unilaterally changed his schedule without permission.

[6]     Plaintiff asserts that "Brodin defended [Defendant] against [Plaintiff's] Charges of Discrimination with the EEOC."  (Doc. 60-2 at ¶ 34.)

his disability of his hand from the beginning of working at [Defendant]." (*Id.*)  The notes also included details about Plaintiff's allegations of racial discrimination, retaliation, and other forms of discrimination. (*Id.* at 179-87.)

On October 17, 2014, Brodin provided Defendant with a report detailing the findings of his investigation.  (*Id.* at 215-37.)  Brodin concluded that "[b]ased upon my review of the documents and interviews with employees, I found that management and employees have not been engaging in wrongful conduct against African-American employees."  (*Id.* at 216.)  With respect to Plaintiff, Brodin concluded that "the facts gathered in this investigation through documents and employee interviews, including [Plaintiff], do not support his claims of unfair treatment based upon race." (*Id.* at 217.)  Further, Brodin concluded that:

> [Plaintiff] seems to allege [Dekker] was requiring [Plaintiff to complete paperwork] in spite of, or because of, an alleged disability in his hand.  According to [Plaintiff], he has a disability in his left hand such that he only has 10% use of that hand.  During the interview, [Plaintiff] said this affects his ability to enter information into the computer and that he can only use one hand when moving furniture.  [Plaintiff's] actions over the time he has worked for [Defendant] do not support this contention.  [One of Plaintiff's supervisors] stated that when they were getting ready to move furniture into the Scottsdale store for the opening, [Plaintiff] volunteered to move furniture. [The supervisor] and others observed [Plaintiff] willingly moving heavy furniture with no restriction.  [She] also stated that when she was [Plaintiff's] lead in California, she asked if he needed help with his paperwork because his handwriting was illegible.  [She] offered to enter his information into the computer for him.  [Plaintiff] declined, saying he could do it himself.  He has never mentioned a limitation in his hand to her, and did not appear to have any difficulty entering information into the computer.  The "fast man" story originated from an incident in which the employee intended to tell [Plaintiff] he was too fast on the computer for her to keep up when he was showing the employee how to use the computer.  This claim of a disability in his hand that kept [Plaintiff] from keeping up with the paperwork required by [Dekker] has no basis.  Further, there is no evidence that [Dekker] was requiring [Plaintiff] to do extra paperwork even if he has a disability, other th[an] [Plaintiff's] unsupported claim.

(*Id.* at 220.)

At the beginning of 2015, Plaintiff applied for sales manager and manager-in-training positions at several of Defendant's locations.  (Doc. 56-2 at 55.)  Plaintiff was not selected for the positions.  (*Id.* at 57.)

On March 23, 2015, Plaintiff received his 2014 performance review and a raise.  (Doc. 60-11.)  The review included descriptions of Plaintiff's strengths—such as that he "is a wealth of knowledge and consistently performs at or above average"—and included recommendations for Plaintiff "to work on listening and accepting more feedback and building a better relationship with management and all of his peers."  (*Id.* at 5.)  The section of the review entitled "Performance Summary" provided in relevant part that:

> [Plaintiff] needs to work on adapting to change in leadership and the company.  He tends to do things on his own rather than working in unity to build greatness.  He needs to admit more and take responsibility for mistakes rather than get defensive and deflect the situation. . . .  He needs to respect the feedback and work on finding ways to change the perception of the team member. . . .  [Plaintiff] has had a hard time listening to managers with a purpose.  He tends to get defensive and does not proactively seek for mutual understanding during communication. . . .  [I]t has not been easy communicating with him when tough issues come up that he does not agree with me on. . . .  He doesn't always accept reality and tends to make excuses or hedge the truth if his team gets feedback from anyone.  He needs to be more open to the feedback given and hold his team accountable when necessary.

(*Id.* at 5-6.)  Plaintiff signed the performance review but indicated that he "[d]idn't agree with the [p]erformance summary."  (*Id.* at 6.)

On April 10, 2015, Plaintiff filed the Second EEOC Charge.  (Doc. 60-10 at 2.)  In it, Plaintiff alleged that after he filed the First EEOC Charge, Defendant retaliated against him in the following ways: (1) he was accused of sexual harassment and subjected to an investigation; (2) he received a verbal warning from his sales manager "associated with their continued failure to accommodate [his] disability"; (3) he received unfavorable feedback on his annual performance review; and (4) he applied for jobs and was not selected or promoted.  (*Id.*)

On April 14, 2015, Plaintiff sent an email to Moyer and the sales and warehouse

1   managers for the Scottsdale location with "a request to interview and transfer to Fremont

2   as a Lead." (Doc. 56-3 at 251.)[7]

3       That same day, Plaintiff was terminated. (Doc. 56-2 at 125.)

4       Also that day, the general manager of the Scottsdale location drafted a "Written

5   Performance Counseling Statement," identifying deficiencies in Plaintiff's job

6   performance. (Doc. 56-3 at 247-49.) The document described Plaintiff's

7   "performance/behavior problem(s)," including arriving late to a meeting on April 12, 2015,

8   making statements about another team, and failing to adopt the feedback and

9   recommendations from his March 23, 2015 performance review. (*Id.* at 247-48.) Neither

10  the general manager nor Plaintiff signed the document. (*Id.* at 249.) Plaintiff "dispute[s]

11  the whole entire document." (Doc. 56-2 at 125.)

12      On April 16, 2015, Plaintiff filed the Third EEOC Charge. (Doc. 60-10 at 4.)

13  Plaintiff stated that "[s]ubsequent to [the Second EEOC Charge], I was further retaliated

14  against by being terminated on or about April 14, 2015. The reason I was given was false

15  and I believe that I was terminated in a discriminatory manner for engaging in the protected

16  activity of filing a charge of discrimination and requesting a reasonable accommodation."

17  (*Id.*)

18  II.  Procedural History

19      On May 24, 2022, the EEOC issued Plaintiff a right to sue for the First EEOC

20  Charge and Second EEOC Charge. (Doc. 60-10 at 9-12.)

21      On July 7, 2022, the EEOC concluded that "there is reasonable cause to believe

22  [Defendant] violated Title VII and the ADA when it discharged [Plaintiff] in retaliation for

23  filing a Charge of Discrimination with the EEOC." (*Id.* at 6-7.)

24      On August 16, 2022, Plaintiff filed the complaint. (Doc. 1.)

25

26  _____

    [7]     There is a factual dispute whether Plaintiff followed the proper process for seeking
27  a transfer. Defendant's evidence indicates that Plaintiff did not follow Defendant's process
    for requesting a transfer, which required sign-off from the general manager. (Doc. 56-4 at
28  6-7 ¶ 20.) Plaintiff testified that he reported his application to the sales manager and
    warehouse manager because that was the process when the general manager was out of the
    office, as was the case when Plaintiff applied for the transfer. (Doc. 60-3 at 59-60.)

1    On November 10, 2022, the EEOC issued Plaintiff a right to sue for the Third EEOC

2    Charge.  (Doc. 60-10 at 13-14.)

3    On January 22, 2024, Defendant filed the pending motion for summary judgment.

4    (Doc. 56.)

5    On March 8, 2024, Plaintiff filed a response.  (Doc. 60.)

6    On April 8, 2024, Defendant filed a notice of errata (Doc. 63) and reply (Doc. 64).

7    On April 16, 2024, Plaintiff filed a notice of errata.  (Doc. 65.)

8    On September 25, 2024, the Court issued a tentative ruling.  (Doc. 69.)

9    On October 2, 2024, the Court held oral argument.  (Doc. 70.)

10                                   **DISCUSSION**

11   I.   <u>Legal Standard</u>

12       "The court shall grant summary judgment if [a] movant shows that there is no

13   genuine dispute as to any material fact and the movant is entitled to judgment as a matter

14   of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of

15   the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue

16   in the non-movant's favor."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d

17   1119, 1125 (9th Cir. 2014).  The court "must view the evidence in the light most favorable

18   to the nonmoving party and draw all reasonable inference in the nonmoving party's favor."

19   *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is

20   improper where divergent ultimate inferences may reasonably be drawn from the

21   undisputed facts."  *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks and citation

22   omitted).

23       A party moving for summary judgment "bears the initial responsibility of informing

24   the district court of the basis for its motion, and identifying those portions of 'the pleadings,

25   depositions, answers to interrogatories, and admissions on file, together with the affidavits,

26   if any,' which it believes demonstrate the absence of a genuine issue of material fact."

27   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "In order to carry its burden of

28   production, the moving party must either produce evidence negating an essential element

- 12 -

of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). At the same time, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

II.   Laches

A.   **The Parties' Arguments**

Defendant contends that Plaintiff's claims "are barred by the doctrine of laches" because "[g]enerally, waiting more than four years from the date a charge of discrimination is filed to bring suit under Title VII has been determined to be unreasonable by a majority of federal courts considering the issue." (Doc. 56 at 16-17 [collecting cases].) Defendant further contends that "Plaintiff's delay in bringing this action . . . has resulted in extreme prejudice to Defendant" because "most of the individuals with whom Plaintiff worked are no longer employed. In addition, two people that Plaintiff claims engaged in wrongful conduct passed away in 2018 and 2013." (*Id.*)

In response, Plaintiff does not address Defendant's laches argument. (*See generally*

Doc. 60.)

In reply, Defendant argues that "Plaintiff does not address, much less challenge, the unreasonableness of his delay; his Opposition is completely silent as to laches.  Therefore, Plaintiff concedes that his claims are barred by the doctrine of laches."  (Doc. 64 at 1, citation and emphasis omitted.)  Defendant also argues that Plaintiff "does not dispute that he and his counsel filed another lawsuit in 2018 against another employer, yet he inexcusably waited to sue Defendant, resulting in significant prejudice as most of the individuals with whom Plaintiff worked are no longer employed and 'Fred' (whom Plaintiff contends used the 'N-word') and Nagy (whom Plaintiff claims called him 'unpromotable') passed away in 2013 and 2018, respectively."  (*Id.* at 2.)

In his notice of errata, Plaintiff asserts that "Defendant's Reply also inaccurately claims that Plaintiff's claims are untimely, but fails to note that Plaintiff filed this action within 90 days of his receipt of a Right to Sue letter from the EEOC, and a plaintiff must have a right to sue letter before filing a private action in federal court."  (Doc. 65 at 1-2, cleaned up.)

B.    **Analysis**

Neither side has covered itself in glory with respect to the briefing of Defendant's laches claim.  On the one hand, Plaintiff's response brief does not acknowledge, let alone attempt to rebut, Defendant's laches argument.  Instead, Plaintiff only offers a brief response in his "notice of errata."  This approach is impermissible because the point raised in Plaintiff's "notice of errata" is not a correction of a clerical error or factual misstatement that appeared in one of Plaintiff's earlier filings.  Instead, it amounts to the assertion of a new argument that should have been raised earlier.  *See, e.g., Bias v. Moynihan*, 508 F.3d 1212, 1224 (9th Cir. 2007) ("Notices of errata to clarify clerical errors are substantively different from attempts to file supplemental briefs unauthorized by local rules."); *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1095 & n.5 (9th Cir. 2007) (noting that when a litigant "sent the court a 'notice of errata' . . . making a new argument," "[w]e struck the letter because leave to rebrief the case on a new theory was

neither requested nor given").[8]

On the other hand, Defendant is incorrect that Plaintiff's failure to timely address the laches argument compels the entry of summary judgment in Defendant's favor. The advisory committee note to Rule 56's 2010 amendment explains that "summary judgment cannot be granted by default even if there is a complete failure to respond to the motion." This is because "under the summary judgment standard, if the moving party fails to meet its initial burden of production, the opposing party need not produce anything." *Finkle v. Ryan*, 174 F. Supp. 3d 1174, 1181 (D. Ariz. 2016). *See also Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013) (emphasizing that Rule 56 does not "condon[e] summary judgment by default").

The analysis thus turns on whether the laches-related facts asserted in Defendant's motion, which are deemed true based on Plaintiff's failure to respond, are sufficient to establish an entitlement to summary judgment. *Heinemann*, 731 F.3d at 917 ("As the text of the 2010 rule states, the opposing party's failure to respond to a fact asserted in the motion permits a court to consider the fact undisputed for purposes of the motion.") (cleaned up). They are not. Defendant's motion concedes that Plaintiff filed various EEOC charges before his termination (Doc. 56 at 9, 11) and does not contend that Plaintiff engaged in undue delay after receiving a right-to-sue letter from the EEOC. To the contrary, Defendant acknowledges that "Plaintiff contends he was waiting on the EEOC before filing a lawsuit." (*Id.* at 17.)

Defendant makes no effort to explain why Plaintiff was wrong to wait and Ninth Circuit law establishes that Plaintiff did not, at least on this record, forfeit his claims by doing so. "Laches is an equitable doctrine" that "can be used as a defense against a private plaintiff in a Title VII suit." *Brown v. Cont'l Can Co.*, 765 F.2d 810, 814 (9th Cir. 1985). "To establish laches the defendant must show both an unexcused or unreasonable delay by

---

[8]     During oral argument, Plaintiff's counsel suggested that Plaintiff should not have been required to respond to all of Defendant's summary judgment arguments (including the laches argument) in light of the District of Arizona's restrictive page limits governing summary judgment briefing. The Court finds this argument unpersuasive and notes that Plaintiff never requested an expansion of the page limit.

the plaintiff and prejudice to himself." *Id.*  In *Brown*, the plaintiff filed his first EEOC charge—the one relevant to the suit—in July 1977.  *Id.* at 812.  However, the EEOC did not issue the plaintiff a right-to-sue letter until November 1983.  *Id.*  Based on these facts, the Ninth Circuit concluded that "Brown did not deliberately delay seeking a right-to-sue letter.  Furthermore, he filed within ninety days of a valid right-to-sue letter." *Id.* at 815.

Here, Plaintiff filed EEOC charges on June 24, 2014 (Doc. 56-3 at 173-76), April 10, 2014 (Doc. 60-10 at 2), and April 16, 2014 (*id.* at 4).  However, the EEOC did not issue Plaintiff a right-to-sue letter for the First and Second EEOC Charges until May 24, 2022 (*id.* at 9-12) and for the Third EEOC Charge until November 10, 2022 (*id.* at 13-14). Plaintiff filed this action on August 16, 2022 (Doc. 1), within 90 days of the first right-to-sue letter and before the issuance of the second right-to-sue letter.  Thus, Plaintiff did not engage in an unexcused or deliberate delay before filing suit—rather, the delay arose from the seven-plus years that the EEOC took to investigate Plaintiff's claims.  The Ninth Circuit "has recognized that EEOC delays are not to be charged against private plaintiffs and that complainants are not required to terminate the administrative process by requesting a notice of right-to-sue." *Brown*, 765 F.2d at 815.  "Ordinarily, if the EEOC retains control over a charge, a private plaintiff will not be charged with its mistakes." *Id.* (citation omitted).

In *Boone v. Mechanical Specialties Co.*, 609 F.2d 956 (9th Cir. 1979), which was not cited by either party, the Ninth Circuit recognized a limited exception to this rule where "[a]n EEOC representative asked Boone frequently whether he wanted a right-to-sue letter" over the course of a nearly seven-year EEOC investigation but "Boone rejected all of the EEOC's earlier offers of right-to-sue letters." *Id.* at 957-58.  On those facts, "the district court correctly found that Boone's delay in bringing suit was unreasonable." *Id.* at 959. However, the Ninth Circuit emphasized that "[i]n the present case we state the exception and not the general rule.  Normally, it may be reasonable for an aggrieved employee to allow the EEOC to retain jurisdiction over a Title VII action." *Id.* at 960.  Here, unlike in *Boone*, there is no evidence that the EEOC offered to issue a right-to-sue letter to Plaintiff

during its investigation or that Plaintiff turned down that offer.[9]

The authorities cited in Defendant's motion (Doc. 56 at 17)—including *Occidental Life Ins. Co. of California v. EEOC*, 432 U.S. 355 (1977), which defense counsel emphasized during oral argument—do not compel a different result. All of those cases involved Title VII enforcement actions brought directly by the EEOC, not Title VII actions brought by private plaintiffs. *See, e.g., EEOC v. Alioto Fish Co., Ltd.*, 623 F.2d 86, 88 (9th Cir. 1980) ("In this case the EEOC filed suit 62 months after Stone first filed a charge against Alioto. The EEOC does not suggest an excuse other than its backlog of cases for the nineteen-month period before its reasonable cause determination, the subsequent ten-month delay before the commencement of conciliation proceedings, or the twenty-month delay after the termination of conciliation efforts before the EEOC brought suit. The agency's workload has been rejected as an excuse for unreasonable delay. We conclude that the district court did not err in finding as a matter of law that the EEOC's delay in this case was unreasonable.") (citations omitted). And as noted, "[o]rdinarily, if the EEOC retains control over a charge, a private plaintiff will not be charged with its mistakes." *Brown*, 765 F.2d at 815.[10]

III.    Title VII Claim—Disparate Treatment

A.    **The Parties' Arguments**

Although the complaint is not a model of clarity as to Plaintiff's theories of liability, it appears to assert a Title VII claim for disparate treatment—as distinguished from a Title VII claim for a hostile work environment—based on Plaintiff's race and color. Among other things, the complaint alleges that Plaintiff received "racially discriminatory

---

[9]    Defendant emphasizes in its reply that "[Plaintiff] and his counsel filed another lawsuit in 2018 against another employer" (Doc. 64 at 2), but the Court cannot see how that fact, standing alone, changes the laches analysis. At most, the existence of the other lawsuit shows that Plaintiff knew how to file a Title VII action after receiving a right-to-sue letter from the EEOC, which is the same thing he did here.

[10]    In the tentative ruling, the Court also concluded that Defendant failed to satisfy the second element of its laches claim (unfair prejudice). During oral argument, defense counsel raised several reasons for questioning that conclusion. Because, as discussed above, Defendant has failed to establish an entitlement to summary judgment on the first element of its laches claim (unreasonable delay by Plaintiff), it is unnecessary to resolve Defendant's arguments as to the second element.

performance evaluations," was "denied . . . promotions and other professional opportunities based on his race," was "subjected . . . to unjustified surveillance based on his race," was "falsely accused . . . of misconduct based on his race," and was "disciplined . . . without cause based on his race." (Doc. 1 ¶ 12.)

Defendant seeks summary judgment on any disparate treatment claim for the following reasons: (1) "Plaintiff cannot show discriminatory motive or that but-for his race, Defendant would have acted differently"; (2) "Plaintiff also cannot show that Defendant's legitimate, non-discriminatory and non-retaliatory reasons for its decisions were pretextual"; (3) any claim of disparate treatment is foreclosed by the "same-actor inference"; (4) "to the extent Plaintiff bases his claims on his disagreement with managerial decisions regarding scheduling, pay, discipline, and promotions, Title VII does not require the employer have a good cause for its decision"; and (5) "with respect to his non-selection for [sales manager] in February 2015, Plaintiff admits that other than two individuals, he does not know who else was interviewed and does not have information about their qualifications and experience." (Doc. 56 at 13-15.)

Plaintiff does not address any of these argument in his response. Instead, Plaintiff simply argues that he should survive summary judgment on his hostile work environment claim (Doc. 60 at 12-16), his retaliation claim (*id.* at 16-18), and his punitive damage claim (*id.* at 18).

In reply, Defendant take notes of Plaintiff's failure to respond. (Doc. 64 at 1-3.) Defendant also contends that Plaintiff "does not and cannot dispute that his claims are based on disagreements with managerial decisions, his continued inability to accept feedback, a perceived attempt by Plaintiff to circumvent his General Manager ('GM') by having another manager sign his transfer application, and challenges that came with Defendant's expansion outside of California." (*Id.* at 9-10.)

B.   **Analysis**

Title VII "makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 63 (1986) (quoting 42 U.S.C. § 2000e-2(a)(1)). In that Ninth Circuit, Title VII claims are analyzed via the *McDonnell Douglas* burden-shifting framework. *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010). Under that framework:

> [P]laintiffs must first establish a prima facie case of employment discrimination. If plaintiffs establish a prima facie case, the burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action. If defendant meets this burden, plaintiffs must then raise a triable issue of material fact as to whether the defendant's proffered reasons . . . are mere pretext for unlawful discrimination.

*Id.* (cleaned up).

To establish a prima facie case of employment discrimination under Title VII based on circumstantial evidence, plaintiffs must show: "(1) that they are members of a protected class; (2) that they were qualified for their positions and performing their jobs satisfactorily; (3) that they experienced adverse employment actions; and (4) that similarly situated individuals outside their protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Id.* at 1156 (cleaned up).

Defendant is entitled to summary judgment on any Title VII disparate treatment claim. Even though, as discussed in Part II.B above, summary judgment cannot be granted by default based on a non-movant's failure to respond, such a failure still carries significant consequences. For example, because Plaintiff is the party who bears the initial burden of establishing a prima facie case of disparate treatment, Defendant could permissibly seek summary judgment by pointing out the absence of evidence on that issue. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out that there is an absence of evidence to support the nonmoving party's case.") (internal quotation marks and citations omitted); 2 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 56, at 160 (2022) ("[A]ll courts agree—and this was the critical point of *Celotex*—that the moving

party's only burden is to address the existing proof record and in some measure identify some hole in that proof. The moving party need go no further, and in particular is not obligated to submit new proof showing that there is nothing missing that could fill that hole.").  Defendant made several such *Celotex* arguments here (Doc. 56 at 13-15), so the burden shifted to Plaintiff to come forward with evidence from which a reasonable factfinder could find that he established a prima facie case of disparate treatment.  However, Plaintiff failed to do so—as noted, his response brief does not seek to defend the sufficiency of any disparate treatment claim and instead focuses on his hostile work environment, retaliation, and punitive damage claims.[11]

Accordingly, Defendant is entitled to summary judgment on any claim for disparate treatment under Title VII.[12]

## IV.   Title VII Claim—Hostile Work Environment

### A.   **The Parties' Arguments**

Defendant seeks summary judgment on Plaintiff's hostile work environment claim for two reasons.  First, Defendant argues that "to the extent Plaintiff relies on the 'too fast' comments, Plaintiff admits that once he reported the comments to Defendant's HR, Moyer investigated and instructed employees to stop referencing the 'too fast' comment.

---

[11]    Perhaps it is possible to cobble together, from Plaintiff's discussion of his other claims, some collection of evidence that might be sufficient to establish a prima facie case of disparate treatment under Title VII, but it was Plaintiff's burden to make such a showing in his response brief.  *See generally Christian Legal Soc. Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 488 (9th Cir. 2010) ("Judges are not like pigs, hunting for truffles buried in briefs.") (cleaned up).  Additionally, as discussed in footnote 8 above, the Court is unpersuaded by Plaintiff's counsel's assertion during oral argument that a litigant may choose not to respond to an opponent's summary judgment argument due to the perceived restrictive nature of the applicable page limits.  Plaintiff's counsel's related argument that, in that scenario, the Court has a duty to guess which arguments the silent party would have made and then perform a summary judgment analysis based on those hypothetical arguments is, to put it mildly, inconsistent with Rule 56 and how our adversarial system is meant to function.

[12]    The tentative ruling also identified a separate reason why Defendant is entitled to summary judgment on the Title VII disparate treatment claim—because Plaintiff failed to respond to Defendant's arguments regarding the same-actor inference.  Because the Court has now addressed Defendant's invocation of the same-actor inference in more detail in relation to Plaintiff's Title VII retaliation claim, and because Defendant's entitlement to summary judgment on the Title VII disparate treatment claim does not depend on the same-actor inference, that portion of the tentative ruling has been removed.

Moreover, to the extent Plaintiff relies on his allegation regarding the use of the 'N-word,' putting aside that Plaintiff never identified the use of the word in his written correspondences to Defendant, the allegation amounts to stray comments, which cannot sufficiently support a claim of discrimination. . . .  Here, the alleged comments were infrequent, sporadic, and not physically threatening in any way." (Doc. 56 at 13-14.) Second, Defendant argues it is also "entitled to the protections of the *Faragher/Ellerth* defense" because "when Plaintiff reported conduct to HR, Defendant took prompt action by investigating and addressing the conduct.  To the extent Plaintiff did not report any alleged conduct, Plaintiff either inexcusably delayed in reporting concerns or did not report them at all, including, but not limited to in written letters to HR, Mr. Brodin, his EEOC Charges, and even his Complaint." (*Id.* at 15.)

In response, Plaintiff argues that the complained-of conduct was sufficiently severe or pervasive to support a hostile work environment claim because "[Green] and [Dekker] both used the n-word at work regarding [Plaintiff], and neither was punished for it.  Other workers used it too and also got away with it.  There can be little question that a reasonable Black man would have believed that a workplace that tolerated that vile type of discriminatory misconduct was hostile." (Doc. 60 at 12-14.)  Plaintiff also argues that Defendant's reliance on the *Ellerth/Faragher* doctrine is misplaced because (1) Defendant "failed to interview material witnesses and accepted as true self-serving denials of misconduct" and thus performed an inadequate investigation; and (2) Defendant failed to take any remedial measures in response to Plaintiff's complaints.  (*Id.* at 15-16.)

In reply, Defendant argues that although it "by no means condones race-based comments or use of the 'N-word,'" Plaintiff has merely "identifie[d] two instances of hearing the 'N-word' and three specific instances when he was called 'too fast,' 'too black,' or 'fast man' over the course of two to three months," and because "the alleged comments were infrequent, sporadic, and not physically threatening in any way, Plaintiff's claim fails." (Doc. 64 at 3-4.)  Defendant also seeks to distinguish the cases cited in Plaintiff's brief.  (*Id.* at 4-5.)  As for the *Ellerth/Faragher* defense, Defendant argues that "Plaintiff's

questions about the adequacy of Defendant's investigations are a red herring" for various reasons, including that although "Plaintiff argues that there is no evidence that Moyer or Owens investigated his concerns . . . Plaintiff himself testified that both Moyer and Owens conducted investigations into Plaintiff's various concerns while he was in Scottsdale." (*Id.* at 6-7.)  Defendant also argues that "Plaintiff's contention that Brodin not interviewing Stump, Overstreet, Green, Mendenhall, and Nagy, constitutes a failure to investigate in good faith, fails" because "Stump, Green and Mendenhall were no longer employed" at the time of Brodin's inquiry, Overstreet had a separate pending EEOC charge at the time, and "there is no evidence that there were any allegations asserted against Nagy at the time." (*Id.* at 7-8.)

B.   **Discussion**

1.   Sufficiently Severe Or Pervasive Harassment

"To establish the prima facie hostile work environment claim under . . . Title VII," Plaintiff "must raise a triable issue of fact as to whether (1) [he] was subjected to verbal or physical conduct because of [his] race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment."  *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003) (cleaned up).

Defendant disputes the sufficiency of Plaintiff's evidence as to the third element— that is, whether the unwelcome racial remarks directed toward Plaintiff were sufficiently severe or pervasive.  "[T]o determine whether an environment is sufficiently hostile or abusive," courts "look[] at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (cleaned up).  "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code.  Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of

abusive language, gender-related jokes, and occasional teasing." *Id.* at 788 (cleaned up). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (cleaned up).

Under these standards, a reasonable juror could conclude that the conduct at issue here was sufficiently severe or pervasive to establish a hostile work environment. Construed in the light most favorable to Plaintiff, the evidence shows that (1) in August 2013, when Plaintiff was conducting a training session, one of Plaintiff's co-workers stated that Plaintiff was "too black," which caused others to laugh (Doc. 56-2 at 96); (2) Defendant's corporate trainer, who was present when the remark was made, joined in by saying "we already know that he's too black" (*id.* at 96-97); (3) afterward, Plaintiff reported the episode to one of his supervisors, Green, but "instead of this getting resolved, . . . [Plaintiff] became the corporate laughingstock and people continued to . . . call [him] too fast, too black, and also the N word" (*id.* at 97) for a period of about three months (Doc. 56-3 at 171); (4) separately, about a week after the training incident, one of Plaintiff's co-workers called Plaintiff "nigger" (Doc. 56-3 at 113); (5) Green, who was present when the remark was made, did not correct the co-worker but instead added "that nigger is fast" (*id.*);[13] (6) on a separate occasion, one of Plaintiff's subordinates named Jason Thorne ("Thorne") heard "Green. . . and several other employees in the back warehouse call . . . [Plaintiff] a 'fast nigger' while laughing and making fun of [Plaintiff]" (Doc. 60-6 ¶ 4);[14]

---

[13]   Plaintiff clarified in a declaration that "[i]n my deposition, when I testified that someone used 'the n-word,' the person actually used the word 'nigger,' including my former boss [Green] and the Living Spaces warehouse worker." (Doc. 60-2 ¶ 13.)

[14]   Defendant's request to strike the Thorne declaration (Doc. 64 at 3 n.2) lacks merit. Although Defendant makes a vague allusion to the "sham affidavit" doctrine, Defendant makes no effort to establish that Thorne's declaration contradicts his prior deposition testimony (or even that Thorne was deposed).  Defendant's hearsay objection fares no better, as Thorne attributes the challenged statements to agents of the party-opponent, *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998), and the statements are not, in any event, being offered for the truth of the matter asserted.  *Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1417, 1423 (7th Cir. 1986) (rejecting defendant's argument that "testimony about Lambert should have been excluded as hearsay evidence" because "evidence such as that Lambert called blacks 'niggers' was not used to prove the truth of such utterances (whatever exactly that would mean)").  Finally, Defendant's argument that "there is no evidence that Plaintiff heard the statements" at most goes to the weight of

- 23 -

(7) Thorne also "heard other employees refer to [Plaintiff] as a 'fast nigger' on six or seven other occasions" (*id.* ¶ 5); (8) Thorne also heard another of Plaintiff's supervisors, Dekker, "refer to [Plaintiff] as the 'fast nigger' on multiple occasions while working at the store" (*id.* ¶ 8); (9) Thorne informed Plaintiff of these remarks (*id.* ¶ 11; *see also* Doc. 60-2 ¶ 14); (10) "months" after the training incident, Plaintiff learned that other co-workers were "saying the N word, calling [Plaintiff] too fast" on "the radio" (Doc. 56-2 at 103); and (11) during an introductory meeting, Dekker asked Plaintiff to identify the organizations he "was a member of," Plaintiff responded that he "was at the time a member of the NAACP," and Dekker responded by saying: "[W]hat is that?  A black thing?" (*id.* at 162).

The Ninth Circuit's decision in *McGinest v. GTE Service Corp.,* 360 F.3d 1103 (9th Cir. 2004), in instructive in evaluating the sufficiency of this evidence.  There, the district court granted summary judgment in favor of the defendant in a hostile work environment case where the plaintiff "was subjected to extreme racial insults, as well as more subtle taunts, by supervisors and coworkers.  Racist graffiti such as 'nigger' and 'white is right' regularly appeared in the bathroom and on equipment, and on one occasion a management-level employee called McGinest 'stupid nigger' to his face."  *Id.* at 1115.  The Ninth Circuit reversed, emphasizing that "[a]lthough it is clear that not every insult or harassing comment will constitute a hostile work environment, repeated derogatory or humiliating statements . . . can constitute a hostile work environment."  *Id.* (cleaned up).  The court also held that "[i]t is beyond question that the use of the word 'nigger' is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination.  This word is perhaps the most offensive and inflammatory racial slur in English, . . . a word expressive of racial hatred and bigotry.  Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates."  *Id.* at 1116 (cleaned up).

Here, Plaintiff has come forward with evidence that *two* of his supervisors

Thorne's declaration, not whether it should be struck.

repeatedly used this word to describe him, sometimes in front of subordinates.  Nor does Plaintiff's showing rest solely on this evidence—he has also come forward with evidence that he was repeatedly described as "too black" over a multi-month period in a manner that rendered him a laughingstock and that a supervisor once cast aspersions on his membership in the NAACP.  Thus, even though Defendant correctly notes that "infrequent joking or teasing [is] part of the ordinary tribulations of the workplace," *Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643 (9th Cir. 2021), and that the isolated use of a racial epithet may not be enough to support a hostile work environment claim, *Stevens v. Cty. of San Mateo*, 267 F. App'x 684, 686 (9th Cir. 2008), the evidence here is significantly more substantial.  *See also Mack v. Town of Pinetop Lakeside*, 780 F. App'x 448, 451 (9th Cir. 2019) ("[T]he district court erred in holding that Patterson's use of four racial slurs made in Mack's presence throughout 2015-2016 was insufficient to establish a genuine issue of material fact as to whether Mack was subjected to an abusive work environment.  Three of the four racial slurs Patterson used in Mack's presence contained a term [the n-word] that we have recognized as highly offensive and demeaning perhaps the most offensive and inflammatory racial slur in English.  Because Patterson used such severely offensive language, in the presence of an African-American person three times within one year, along with one other racial slur, a reasonable jury could conclude that Mack's work environment was objectively and subjectively hostile.") (cleaned up).

### 2.   *Ellerth/Faragher* Defense

This leaves Defendant's reliance on the *Ellerth/Faragher* defense.  As background, the general rule is that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher*, 524 U.S. at 807.  However, "[w]hen no tangible employment action (such as firing or demotion) is taken, an employer may avoid liability by asserting a 'reasonable care' defense.  An employer can sustain the affirmative defense if it shows by the preponderance of the evidence (a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and

1    (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or

2    corrective opportunities provided by the employer or to avoid harm otherwise." *Craig v.*

3    *M & O Agencies, Inc.*, 496 F.3d 1047, 1055 (9th Cir. 2007) (cleaned up).

4       For an employer to satisfy the first prong of the *Ellerth/Faragher* defense, it must

5    establish "both preventive and remedial measures." *Hardage v. CBS Broad., Inc.*, 427 F.3d

6    1177, 1185 (9th Cir. 2005). "As for the former, . . . an employer's adoption of an anti-

7    harassment policy and its efforts to disseminate the policy to its employees establish that

8    the employer exercised reasonable care to prevent . . . harassment in the workplace." *Id.*

9    (cleaned up). Plaintiff does not seem to dispute that Defendant satisfied the preventive-

10   measures requirement. Instead, Plaintiff disputes whether Defendant satisfied the

11   remedial-measures requirement, arguing that (1) Defendant's investigations into his

12   complaints were flawed; and (2) Defendant "fails to adduce any evidence it took any

13   remedial measures whatsoever in response to [Plaintiff's] complaints." (Doc. 60 at 15-16.)

14      The Court agrees with Plaintiff that there is a genuine dispute of fact as to the

15   remedial-measures requirement, albeit for different reasons than were identified in the

16   tentative ruling. The analysis in the tentative ruling focused on what the Court perceived

17   to be Defendant's improper burden-shifting on this issue, which consisted of faulting

18   Plaintiff for not identifying the remedial measures that Defendant took in the aftermath of

19   its investigations into Plaintiff's complaints. Because the *Ellerth/Faragher* defense is "an

20   affirmative defense," *Craig*, 496 F.3d at 1055, the tentative ruling concluded that

21   Defendant had thus failed to meet its initial burden of production. *Cf. Grissom v. Freeport-*

22   *McMoran Morenci Inc.*, 2010 WL 3489099, *6 (D. Ariz. 2010) ("Freeport-McMoran bears

23   the initial responsibility of . . . identifying those portions of the record which it believes

24   demonstrate the absence of a genuine issue of material fact. Because Freeport-McMoran

25   has failed to show the Court undisputed evidence that it took care promptly to correct the

26   alleged harassment, the Court cannot find that the *Ellerth* defense is established as a matter

27   of law.") (cleaned up).

28      However, with the benefit of defense counsel's presentation during oral argument,

the Court is satisfied that Defendant did not simply engage in burden-shifting on this issue but also came forward with affirmative evidence of the remedial measures it took in response to Plaintiff's complaints.  In the "Legal Analysis" section of Defendant's motion, the only sentence that touches on the subject of remedial measures is: "As discussed above, when Plaintiff reported the conduct to HR, Defendant took prompt action by investigating and addressing the conduct."  (Doc. 56 at 15.)  Although that sentence may not qualify, in isolation, as a sufficiently developed presentation on the issue of remedial measures, the phrase "addressing the conduct" can be construed as cross-referencing the "Factual Background" section of Defendant's motion, which detailed various ways in which Defendant took remedial action in response to Plaintiff's complaints.  (*See, e.g., id.* at 5 ["Defendant promptly investigated and addressed the concerns Plaintiff identified in his November 1 Letter, including instructing people to stop using the phrase 'fast man.'"]; *id.* at 6 ["[Following] Defendant's investigation into Plaintiff's concerns . . . Defendant also offered Plaintiff the opportunity to transfer to the new Phoenix location as a products specialist and offered to maintain him as his Lead rate of play; however, Plaintiff declined and chose to remain in Scottsdale."].)

　　　　This clarification does not mean that Defendant is entitled to summary judgment.  It simply requires an analysis of the evidence offered by both sides on the issue of remedial measures.  Having now performed that analysis, the Court concludes that a genuine dispute of material fact remains as to the adequacy of Defendant's remedial measures.  The inquiry is unusually fact-bound and complicated here because Plaintiff raised a variety of complaints over a lengthy period of time, Defendant conducted an array of investigations into those complaints, and Defendant took (or chose not to take) various remedial measures following the conclusion of those investigations.  Although Plaintiff does not appear to challenge the adequacy of some of those remedial measures, he does argue that, *inter alia*, (1) "[a]lthough . . . Moyer was aware of [Plaintiff's] complaints of discriminatory harassment against . . . Green, [Defendant] has produced *no* evidence Green was ever disciplined for misconduct" and "[t]o the contrary, [Moyer] told [Plaintiff] that 'Ms. Green

was terminated for accounting issues'"; and (2) Defendant failed to take "any remedial measures whatsoever in response to" the complaints that Brodin investigated, which Defendant instead concluded "were unsubstantiated." (Doc. 60 at 5, 16.) In reply and during oral argument, Defendant did not challenge the factual accuracy of Plaintiff's arguments on these points. Instead, Defendant simply argued that they were insufficient to create a jury question as to the sufficiency of its remedial measures. The Court respectfully disagrees, particularly in light of the line of Ninth Circuit precedent holding that "[a]n employer whose sole action is to conclude that no harassment occurred cannot in any meaningful sense be said to have 'remedied' what happened. Denial does not constitute a remedy. Nor does the fact of investigation alone suffice; an investigation is principally a way to determine whether any remedy is needed and cannot substitute for the remedy itself." *Fuller v. City of Oakland*, 47 F.3d 1522, 1529 (9th Cir. 1995).

V.    Title VII Claim—Retaliation

   A.    **The Parties' Arguments**

   Defendant seems to advance three reasons why it is entitled to summary judgment on Plaintiff's Title VII retaliation claim. (Doc. 56 at 16.) First, Defendant argues that "there is no causal link between any of [Plaintiff's] concerns or EEOC charges and any adverse employment action" because "Plaintiff worked at Scottsdale for almost two years; thus, to the extent he relies on temporal proximity, his claim fails as the time between any alleged protected activity and adverse employment actions is either too remote, or in the case of Plaintiff's final protected activity of filing his second EEOC charge, Plaintiff admits he does not know if Defendant was aware of the charge." (*Id.*) Second, Defendant argues that it has "established legitimate, non-discriminatory and non-retaliatory reasons for its decisions for which Plaintiff cannot show pretext." (*Id.*) Third, Defendant argues that "Plaintiff admits that Defendant treated him favorably by giving him positive evaluations, promotions, raises, and approving him for application for an additional promotion." (*Id.*)

   In response, Plaintiff begins by clarifying the theory of liability underlying his Title VII retaliation claim. (Doc. 60 at 16-17.) First, Plaintiff contends that he engaged in

protected activity by raising complaints of discriminatory conduct with various supervisors and by filing the First and Second EEOC Charges. (*Id.* at 17. *See also id.* at 5 ["Soon after [Plaintiff] complained to [Green] about the discriminatory harassment at the August 2013 training, she started to retaliate against him. On September 26, 2013, [Green] gave [Plaintiff] a 'three-page write-up' attacking his job performance."].) Second, Plaintiff contends he was subjected to three adverse employment actions based on those protected activities: (1) being written up for poor performance by Green; (2) being discouraged by Owens-Cobb from applying for the sales manager position "because [Nagy] had already decided he would never be promoted because he filed a Charge of Discrimination against the company"; and (3) being fired on April 14, 2015, only four days after he filed the Second EEOC Charge. (*Id.* at 17.) Plaintiff concludes: "Given the fact that [Defendant] admits that [Plaintiff] was one of its top sales supervisors with no record of discipline, this chronology is fraught with factual disputes precluding summary judgment." (*Id.* at 17-18.)

In reply, Defendant reiterates its earlier arguments that Plaintiff cannot rely on temporal proximity to establish causation; that Plaintiff received positive performance reviews, raises, and promotions after he engaged in protected activity; and that the Second EEOC Charge cannot provide the basis for any retaliation claim because there is no evidence that Defendant was aware of that charge at the time it terminated Plaintiff. (Doc. 64 at 8-9.)

## B.   **Discussion**

"Title VII's antiretaliation provision forbids employer actions that discriminate against an employee . . . because he has opposed a practice that Title VII forbids or has made a charge, testified, assisted, or participated in a Title VII investigation, proceeding, or hearing." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (cleaned up). Title VII retaliation "claims follow the same burden-shifting framework described in *McDonnell Douglas*." *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011). "To establish a prima facie case, the employee must show that he engaged in a protected activity, he was subsequently subjected to an adverse employment action, and that a causal

link exists between the two." *Id.* "The causal link can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action." *Id.* "If a plaintiff has asserted a prima facie retaliation claim, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision." *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). "If the defendant articulates such a reason, the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive." *Id.*

### 1.   <u>"Employee Warning Notice" In September 2013</u>

Plaintiff has come forward with enough evidence to survive summary judgment on his Title VII retaliation claim. For example, Plaintiff proffers evidence that soon after the August 2013 training incident, he complained to his supervisor, Green, that he was being subjected to racial harassment. (Doc. 56-2 at 97 ["So, after the training, . . . I talked to [the trainer] and told him my disgust of him telling everybody I'm too black and that was unacceptable. And I also notified my GM, which was [Green] at the time."].) A reasonable juror could conclude that this complaint qualifies as protected activity under Title VII. *Ray*, 217 F.3d at 1240 n.3 ("Making an informal complaint to a supervisor is . . . a protected activity.").

Plaintiff also proffers evidence that on September 26, 2013, Green drafted a written "Employee Warning Notice" that identified various instances in which Plaintiff's job performance did "not meet the company's expectations as it relates to the . . . Department Lead job description." (Doc. 56-2 at 150-52 [actual document]; Doc. 60-4 [First EEOC Charge: "In September 2013, [Green] . . . attempted to issue me a three-page write-up."].) Although Defendant contends in its reply brief (Doc. 64 at 9) and reiterated during oral argument that the issuance of this document cannot qualify as an adverse employment action because it "was never enforced" and was not a formal performance review, these arguments overlook that "Title VII retaliation claims may be brought against a much broader range of employer conduct than substantive claims of discrimination. Namely, a

Title VII retaliation claim need not be supported by an adverse action that materially altered the terms or conditions of the plaintiff's employment; instead an allegedly retaliatory action is subject to challenge so long as the plaintiff can show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Campbell v. Hawaii Dep't of Educ.*, 892 F.3d 1005, 1021 (9th Cir. 2018) (cleaned up).  Thus, the Ninth Circuit has concluded that a "formal warning . . . could deter a reasonable employee from engaging in protected activity," in part because such a warning could put the employee "at risk of more serious discipline in the future." *Annenberg v. Clark Cnty. Sch. Dist.*, 818 F. App'x 674, 677 (9th Cir. 2020).  It follows that a reasonable juror could conclude that the written "Employee Warning Notice" was an adverse employment action for purposes of Plaintiff's Title VII retaliation claim.[15]

Finally, due to the close temporal proximity—less than two months—between these two events, a reasonable juror could infer a causal relationship between them.  *Thomas v. City of Beaverton*, 379 F.3d 802, 812 (9th Cir. 2004) ("The causal link between a protected activity and the alleged retaliatory action can be inferred from timing alone when there is a close proximity between the two.  Here, . . . approximately seven weeks after Thomas first supported Perry's promotion, Miller informed Thomas that she was being placed on extended probation.  We have held that events occurring within similar intervals of time are sufficiently proximate to support an inference of causation.") (cleaned up).

Because Plaintiff met his burden of establishing a prima facie case of retaliation as to the September 2013 write-up, "the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision." *Ray*, 217 at 1240.  Defendant has not met that burden here.  Although Defendant's motion contains a conclusory assertion that it has "established legitimate, non-discriminatory and non-retaliatory reasons for its decisions for which Plaintiff cannot show pretext" (Doc. 56 at 16), Defendant's motion

---

[15]    In contrast, it is unlikely that the issuance of this document would qualify as an adverse employment action for purposes of a Title VII discrimination claim.  *Anderson v. Intel Corp.*, 2021 WL 1087127, *10 (D. Ariz. 2021) (canvassing cases).

1    papers make no effort to develop this argument with respect to the September 2013 write-

2    up.  Moreover, in other portions of its motion papers, Defendant seemingly acknowledges

3    that this write-up may not have been warranted.  (Doc. 64 at 9 ["[T]o the extent Plaintiff

4    relies on the write-up from Green . . . Plaintiff admits that Green's write-up was never

5    enforced (and that he did not receive it until Moyer provided it) . . . ."].)

6                    2.    Rejected Application For Promotion In Early 2015

7            Although the summary judgment analysis could end there (as it did in the tentative

8    ruling), Plaintiffs' counsel emphasized during oral argument that the retaliation claim is

9    also based on Defendant's rejection, in early 2015, of Plaintiff's application to serve as a

10   store manager at several of Defendant's California locations, which would have been a

11   promotion.  Significantly, Plaintiff avows in his declaration that "[w]hen I was waiting to

12   be interviewed, I received a call on my cell phone from [Owens-Cobb], who informed me

13   that I was 'wasting my time' with the interview because Vice President Ryan Nagy had

14   told her that I would never be promoted because I had filed a Charge of Discrimination

15   against the company."  (Doc. 60-2 ¶ 25.)[16]

16           Assuming, as the Court must at this stage of the case, that the phone call occurred

17   as Plaintiff describes it, a reasonable juror could easily find a prima facie case of retaliation.

18   First, Plaintiff engaged in protected activity by filing an EEOC charge.  *Pardi v. Kaiser*

19   *Foundation Hospitals*, 389 F.3d 840, 850 (9th Cir. 2004) (filing an EEOC charge qualifies

20   as protected activity).  Next, Plaintiff suffered an adverse action by being rejected for a

21   promotion.  *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) (noting that

22   one of the "employment decisions that can constitute an adverse employment action" in a

23   Title VII retaliation case is "refusal to consider for promotion").  Finally, Nagy's comment

24   _____

25   [16]     Defendant's undeveloped hearsay and "sham affidavit" objections to this portion of
         Plaintiff's declaration (Doc. 64 at 3 n.2) fail to similar reasons as its objections to the
26   Thorne declaration—although paragraph 25 of Plaintiff's declaration might, at first blush,
         appear to contain two levels of hearsay, each statement (Nagy to Owens-Cobb and Owens-
27   Cobb to Plaintiff) is either a "statement . . . by the party's agent or employee on a matter
         within the scope of that relationship and while it existed," Fed. R. Evid. 801(d)(2)(D); "a
28   statement of the declarant's then-existing state of mind (such as motive, intent, or plan),"
         Fed. R. Evid. 803(3); or both.

qualifies as direct evidence—rather than the usual formula of circumstantial evidence arising from temporal proximity—of a causal connection between the two.[17]

In its reply brief, Defendant contends that Plaintiff "does not have information about [the] qualifications and experience" of the individuals who were selected for the vacant positions.  (Doc. 64 at 9.)  To the extent this was an attempt to articulate a legitimate, nondiscriminatory reason for the challenged decision under the next step of the *McDonnell Douglas* framework, it is unavailing.  It was Defendant's burden at this stage of the analysis to articulate why others were selected over Plaintiff, not Plaintiff's burden to show why the selection was unjustified.  *Ray*, 217 at 1240.

### 3.   Same-Actor Inference

During oral argument, defense counsel urged the Court to find that Plaintiff's Title VII retaliation claim is barred by the same-actor inference.  Because this issue was not addressed in the tentative ruling, the Court elaborates here on why Defendant is not entitled to summary judgment on this basis.

First, Defendant seems, at least at times, to conceptualize itself as the relevant "actor" for purposes of the same-actor inference.  Operating from that premise, Defendant argues that because Plaintiff received various raises, promotions, and positive performance evaluations throughout his tenure as an employee, this negates any inference that Defendant could have harbored discriminatory or retaliatory animus toward him.  (Doc. 56 at 13 ["[Plaintiff] admits that Defendant treated him favorably by giving him positive evaluations, promotions, raises, and approving him for application for an additional promotion.  Defendant did so despite knowing Plaintiff's race and despite knowing about the concerns he raised to HR and about at least one of his EEOC charges."]; Doc. 64 at 2-3, cleaned up ["[Plaintiff] admits Defendant treated him favorably throughout his

---

[17]    Defendant seems to question the causal link by noting that Plaintiff admitted, during his deposition, that he did "not know whether the panel had already made its decision prior to Plaintiff's interview."  (Doc. 64 at 9.)  Even so, a reasonable juror could easily find a causal link on the current record, where one of the interviewers stated before the interview that Plaintiff would never be selected due to his protected activity.  *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir. 1986) ("[T]he plaintiff can prove causation by providing direct evidence of retaliatory motivation.").

employment, including, but not limited to, his hire in 2009; raises and bonuses in each year of his employment between 2009 and 2015; transfer opportunities in 2013, 2014, and 2015; promotion application approvals in 2012, 2013, and 2015, . . . and promotions to Lead in 2010 and 2013. . . .  Where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive."].)

The problem with this approach is that the same-actor inference does not broadly apply to a company as a whole.  Instead, it applies when an individual agent who provides a positive employment benefit to the plaintiff, such as choosing to hire or promote the plaintiff, is the same agent who later chooses to impose an adverse action.  *See, e.g., Schechner v. KPIX-TV*, 686 F.3d 1018, 1026 (9th Cir. 2012) ("Where *the same actor* is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive.") (cleaned up) (emphasis added); *Coburn v. PN II, Inc.*, 372 F. App'x 796, 799 (9th Cir. 2010) ("[T]he district court erred in applying the 'same-actor inference' to Coburn's case.  Although Degen was involved in both the hiring and firing of Coburn, he was not the only person involved in these decisions and was not even Coburn's direct supervisor at the time of these decisions.  Rather, Coburn reported directly to Palmer at the time of her hiring and directly to Koart at the time of her firing.  Thus, it was unreasonable for the district court to assume that a lack of discriminatory animus at the time of Coburn's hiring makes it unlikely that discriminatory animus was present at the time of her firing."); *Coghlan v. American Seafoods Co., LLC.*, 413 F.3d 1090, 1096 (9th Cir. 2005) ("[T]he so-called 'same actor inference' . . . is relevant here because Inge Andreassen, the man who made all of the challenged employment decisions, was *the same man* who [promoted] Coghlan . . . .") (emphasis added).

Second, a related difficulty is that Defendant does not distinguish between Plaintiff's discrimination and retaliation claims when invoking the same-actor inference.  However, some courts have concluded that the inference is inapplicable to retaliation

claims.  *Foosaner v. Crown Castle USA, Inc.*, 2023 WL 5435605, *6 (E.D. Va. 2023)
("[T]he same-actor doctrine from the employment discrimination context . . . [applies]
because, for the most part, the characteristics protected by the employment discrimination
statutes are visible at hiring.  In other words, the person doing the hiring does so with full
knowledge of the protected characteristic.  Defendant cites no Fourth Circuit cases
extending the same actor inference to retaliation claims, where the existence of a protected
activity cannot be known beforehand, and no Fourth Circuit cases extending the doctrine
to that context could be found.  There are good reasons not to extend this doctrine beyond
the discrimination context.") (cleaned up).  Additionally, even assuming the inference is
potentially applicable in the retaliation context, it would require a more targeted showing
than in the discrimination context—the proponent would need to establish that an
individual agent became aware that the plaintiff had engaged in protected activity, that the
agent then provided a positive employment benefit to the plaintiff, and that the agent then
imposed an adverse action.

　　　　With this backdrop in mind, Defendant is not entitled to summary judgment on
Plaintiff's retaliation claim based on application of the same-actor inference.  To prevail
on that theory, Defendant would have needed to establish, for example, that Green became
aware that Plaintiff had engaged in protected activity, then provided a positive employment
benefit to Plaintiff, and then issued the September 2013 write-up.  However, Defendant
made no attempt to make that sort of targeted sequential showing.

## VI.　ADA Claim

### A.　**The Parties' Arguments**

　　　　In the "Factual Background" portion of its motion, Defendant asserts that "[w]ith
respect to his inability to type, . . . Plaintiff could not identify examples of where his
disability was not taken into consideration and . . . agreed that there were not any situations
where his alleged disability was an issue.  Notably, Plaintiff admits that he never submitted
a doctor's note indicating he could not type and he failed to identify any restrictions about
typing when he was given a document setting forth the essential job duties of his position

as a Lead." (Doc. 56 at 7.) Later, in the "Legal Analysis" portion of its motion, Defendant identifies the elements of an ADA claim (*id.* at 12) but does not develop any reasoned argument as to why Plaintiff's ADA claim is insufficient to survive summary judgment.

Plaintiff's only references to his alleged disability occur in the "Factual Background" section of his response brief. (Doc. 60 at 6.) There, Plaintiff asserts that he "suffered an injury to his left hand that left it partially paralyzed. This forced him to type with his right hand and slowed down his completion of his paperwork on the computer." (*Id.*, citation omitted.) Plaintiff also asserts that his supervisors refused to provide him with extra time to complete his paperwork after initially allowing him "to work off the clock to catch up with his paperwork." (*Id.*)

In reply, Defendant argues that "Plaintiff contends he was not permitted extra time to do paperwork or to work off the clock as a result of his disability; however, he does not and cannot dispute that [Owens-Cobb] investigated the matter, that he never submitted a doctor's note indicating he could not type, and that he failed to identify any restrictions about typing when he acknowledged the essential job duties of his position as a Lead." (Doc. 64 at 5.)

B.     **Analysis**

Defendant is not entitled to summary judgment on Plaintiff's ADA claim for the simple reason that Defendant did not properly challenge the sufficiency of that claim in its motion. As noted, Defendant did not raise any developed argument concerning Plaintiff's ADA claim in the "Legal Analysis" section of its motion and made only a passing reference to the facts underlying Plaintiff's ADA claim in the "Factual Background" section of its motion. This approach was insufficient under Rule 56. *See, e.g., Costello v. Grunden*, 651 F.3d 614, 635 (7th Cir. 2011) ("The nonmovant is not required to present evidence on an issue not raised by the movant."); Gensler, *supra*, Rule 56 ("The nonmoving party's burden [at summary judgment] is defined by the issues raised in the motion. Any issues properly raised in the motion should be responded to, and in particular the nonmoving party must marshal its proof . . . with respect to any issues identified as the basis for a *Celotex*-type

- 36 -

'no evidence' motion.  But the nonmoving party is under no obligation to respond to issues not raised in the motion.").[18]

VII.   <u>Punitive Damages</u>

A.   **The Parties' Arguments**

Defendant seeks summary judgment on Plaintiff's claim for punitive damages because "Plaintiff cannot [show] that Defendant acted with malice or with reckless indifference to his federally protected rights.  Again, Defendant responded to, investigated and addressed each of the allegations he submitted.  Defendant also attempted to assist Plaintiff and did, in fact, advance Plaintiff within the Company."  (Doc. 56 at 17-18.)

In response, Plaintiff contends that his claim for punitive damages should survive summary judgment because (1) Defendant "has failed to produce any evidence that the two human resources professionals with any involvement in this case, [Moyer and Owens-Cobb], investigated [his] internal complaints or his complaints to the EEOC"; (2) "[s]imilarly, Jeff Brodin failed to interview multiple material witnesses and revealed his partisan nature by appearing as [Defendant's] legal advocate before the EEOC"; and (3) more broadly, Defendant's "failure to take any remedial measures in response to [Plaintiff's] complaints and its termination of [Plaintiff] without notice or explanation is strong evidence of malice at worse and reckless disregard at best."  (Doc. 60 at 18.)

In reply, Defendant reiterates its earlier arguments, contends that "Plaintiff's arguments that Moyer and [Owens-Cobb] did not investigate his complaints are clearly contradicted by his own deposition testimony and admissions," and contends that "Brodin's involvement as the investigator and later counsel for Defendant in connection with Plaintiff's second EEOC charge is without merit as Defendant responded to Plaintiff's second and third EEOC charges *after* Plaintiff's employment with Defendant was terminated."  (Doc. 64 at 11.)

…

---

[18]     The tentative ruling also contained an alternative analysis of the sufficiency of the evidence underlying Plaintiff's ADA discrimination claim.  On reflection, and because that analysis is not necessary to the outcome here, it has been removed from this order.

B.     **Analysis**

Although the tentative ruling concluded that Defendant's motion for summary judgment as to punitive damages should be granted, the Court now concludes, upon reflection and with the benefit of oral argument, that summary judgment as to punitive damages should be denied.

In *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493 (9th Cir. 2000), the Ninth Circuit explained that there are two separate inquiries when evaluating the availability of punitive damages in a Title VII case: *first*, whether the underlying conduct was sufficiently culpable to warrant an award of punitive damages; and *second*, if so, whether the employer has "establish[ed] an affirmative defense to punitive damages liability," which arises "when they have a bona fide policy against discrimination, regardless of whether or not the prohibited activity engaged in by their managerial employees involved a tangible employment action." *Id.* at 515-16.

As for the first inquiry, "the standard governing the availability of punitive damages in Title VII cases requires proof of 'malice or reckless indifference' to the rights guaranteed by Title VII." *Id.* at 516.  Thus, "an employer may be liable for punitive damages in any case where it discriminates in the face of a perceived risk that its actions will violate federal law. . . .  [A]lthough egregious conduct could be evidence of intent to break the law, such conduct [is] not required to establish punitive damages liability.  Thus, in general, intentional discrimination is enough to establish punitive damages liability." *Id.* at 515 (cleaned up).  However, *Passantino* also identified three scenarios in which punitive damages may be unavailable even if intentional discrimination is shown:

> [*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999)] acknowledged that there could be some instances in which intentional discrimination did not give rise to punitive damages liability.  The Court set forth three areas in which the factfinder could find intentional discrimination but the defendant would nonetheless not be liable for punitive damages.  First, if the theory of discrimination advanced by the plaintiff was sufficiently novel or poorly recognized, the employer could reasonably believe that its action was legal even though discriminatory.  Second, the employer could believe it had a valid BFOQ [bona fide occupational qualification] defense to its

discriminatory conduct.  Third, in some (presumably rare) situations, the employer could actually be unaware of Title VII's prohibition against discrimination.  Common to all of these exceptions is that they occur when the employer is aware of the specific discriminatory conduct at issue, but nonetheless reasonably believes that conduct is lawful.  Under such circumstances, an employer may not be liable for punitive damages.

*Id.*

Here, a reasonable juror could conclude that the evidence is sufficient to satisfy the first inquiry.  As discussed above in relation to Plaintiff's retaliation claim, Plaintiff has come forward with evidence that Nagy thwarted Plaintiff's application for a promotion in an effort to retaliate against Plaintiff for his earlier filing of an EEOC charge of discrimination.  This is the sort of "intentional discrimination" that, under *Passantino*, is generally "enough to establish punitive damages liability," and this episode does not implicate any of the three exceptions recognized in *Kolstad* and *Passantino*—it does not raise a novel or poorly recognized theory of liability, it has nothing to do with bona fide occupational qualifications, and it is not one of those "presumably rare" situations where the employer was subjectively unaware of Title VII's prohibition against discrimination.

This leaves the second inquiry, which is whether Defendant can establish an affirmative defense to vicarious liability.  *Passantino* explained that this affirmative defense turns in part on "[a] determination regarding the status of the principal actors," which "is crucial to the outcome," because although "*Kolstad* established that, under some circumstances, corporations may not be subject to punitive damages for actions taken by their 'managerial' employees, it did nothing to eliminate the rule established in earlier cases that an individual sufficiently senior in the corporation must be treated as the corporation's proxy for purposes of liability."  *Passantino*, 212 F.3d at 516.  *See also Alvarado v. Fed. Express Corp.*, 384 F. App'x 585, 590 (9th Cir. 2010) ("Where . . . the agent is 'sufficiently senior,' he must be treated as the corporation's proxy for purposes of liability and the affirmative defense is unavailable."); *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1198 (9th Cir. 2002) ("The affirmative defense is thus unavailable to the employer for the actions

of agents sufficiently senior to be considered proxies.").  Defendant is the party with the burden of proof with respect to this affirmative defense but has made no effort to show that Nagy, who served as a vice president (Doc. 56 at 3), was insufficiently senior to serve as a proxy.  At any rate, the Court concludes that this issue presents a jury question on this record.  *Cf. Erwin v. OBI Seafoods, LLC*, 2024 WL 1138905, *17-18 (W.D. Wash. 2024) (noting that *Passantino* suggested that "a vice president of sales . . . [who was] 'sufficiently senior' . . . may be treated as an employer's proxy for liability purposes" before concluding that "a reasonable juror could conclude that Pokorny had sufficient authority and discretion as plant manager to be considered a 'senior manager' for purposes of punitive damages"); *Flowers v. Fred Hutchinson Cancer Research Ctr.*, 2018 WL 6019276, *10 (W.D. Wash. 2018) ("The Court concludes that there are remaining factual issues that must be resolved before it can rule on the issue of punitive damages.  For example, it is not entirely clear where [the agents responsible for the retaliation] fit within [defendant's] organizational hierarchy. . . .   Based on the current record, [defendant] has not met its burden to demonstrate that [plaintiff] is precluded from seeking punitive damages at trial.").[19]

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment (Doc. 56) is **granted in part and denied in part**.

Dated this 7th day of October, 2024.

_____
Dominic W. Lanza
United States District Judge

---

[19]   Given these conclusions, the analysis in the tentative ruling as to why Defendant's investigatory efforts and reliance on the Brodin report were inconsistent with a finding of malice or reckless indifference does not control the outcome.